[No. 16061.   Department One.   December 3, 1920.]

NORTHERN BANK & TRUST COMPANY, *by Louis H. Moore, State Bank Examiner, Respondent,* v. CLEMENT B. COFFIN *et al., Appellants.*[1]

BILLS AND NOTES (135, 136)—ACTIONS—EVIDENCE—SUFFICIENCY—DELIVERY AND CONSIDERATION. Findings that defendant's note was given for the accommodation of the president of a bank, and not for the bank, are sustained where it appears that, on solicitation, he executed a note to the bank, which was deposited to his credit, and checked out by check to "cash" delivered to the president, who gave his personal note in the same amount and terms to the defendant, the president testifying that it was intended as a loan to him and that he agreed to pay defendant's note to the bank, and defendant showing no warrant for his belief that the transaction was other than it appeared on its face.

HUSBAND AND WIFE (74)—COMMUNITY PROPERTY—COMMUNITY DEBTS—CREDIT TO HUSBAND. A husband's note to a bank constitutes a community debt, and not a separate debt as a surety for the president of the bank, where the transaction amounted to a loan for the accommodation of the president, who gave his individual note in return, and received the proceeds of the bank note, which was credited to the husband and checked out by him in favor of the president.

Appeal from a judgment of the superior court for King county, Ronald, J., entered November 22, 1919, upon findings in favor of the plaintiff, in an action on a promissory note, tried to the court. Affirmed.

*C. A. Riddle,* for appellants.

*D. E. Twitchell,* for respondents.

[1]Reported in 194 Pac. 404.

PARKER, J.—This is an action upon a promissory note executed and delivered by the defendant Coffin to the Northern Bank & Trust Company on July 27, 1916, payable ten days after date, for the sum of $2,000, with eight per cent interest thereon until paid. The action was commenced and prosecuted by the state bank examiner, who has charge of the affairs of the bank because of its insolvency. A trial in the superior court without a jury resulted in findings and judgment awarding to the plaintiff recovery as prayed for, from which the defendants have appealed to this court.

The making of the note by appellant and that he has not paid it, is admitted by him. He sets up as an affirmative defense, in substance, that the note was given without consideration and with the express oral understanding, had at the time of its execution between him and Mr. Collier, the president of the bank, that he should never be held liable for the payment of the note. Appellant is in the jewelry business in which he has been engaged in the city of Seattle for many years. Evidently he is a merchant of good business capacity. At the time of executing the note in question, his store was situated next door to the Northern Bank & Trust Company. He had done his banking business with that bank for many years; not only as a depositor, but also as a borrower, and at the time of the execution of the note here in question, he was indebted to the bank $3,400. He had always been a good and reliable customer of the bank, never being in default in any of his obligations to it. He was, in a business way, somewhat intimately acquainted with Collier, the president of the bank, though it cannot be said that such acquaintance was other than of a purely business nature. Each seems to have then had rather a high regard for the business integrity and ability of the other. Appel-

lant's version of the transaction, of which the making of the note in question was a part, is testified to by him as follows:

"Q. What date was it you were called? A. The 26th, and he asked me to come in and he wanted to talk to me. I said 'Important Mr. Collier'? Well, he said, 'Come in, it is important.' And I said all right, and so I went in and we had a conversation and he told me that the bank wanted two thousand dollars; that he wanted to exchange notes and he would give me the bank's note and I would give him my note, and then I kind of parlied backwards and forwards and didn't want to give this note. Q. Why; on what grounds; what reason? A. Because it would injure my business; I considered that I was indebted to them to the extent of thirty-four hundred dollars and if I went any further that it would impair my business and it would put my business in such shape that it would not look good to my creditors. . . . Mr. Collier assured me that there would be no indebtedness on my part, and finally I consented to exchanging these notes. That evening I drew the check for the amount. The next morning I went into Mr. Collier again and I told him I thought I was doing wrong. He said 'No, you are not. There will be no indebtedness on your part, and at the end of ten days the bank will take care of the paper,' and at that I exchanged notes with him and he made out those notes, and I handed him mine and he handed me the one that is here in evidence."

This is, in substance, the whole of appellants' version of what was said at his conference with Collier on those two days. As a result of their conference on the 26th, appellant then received credit for $2,000 as a depositor of the bank, and then drew his check against his deposit account for $2,000 payable to "Cash" (which it is conceded was in effect to bearer so as not to need any endorsement upon presentation), and delivered the check to Collier. At their conference on the 27th, appellant executed and delivered to

the bank—that is, delivered to Collier as its president
—the note here sued upon, and at the same time Col-
lier individually executed and delivered to appellant
a note of the same date, for the same amount; running
the same length of time, and drawing the same rate of
interest. There is nothing upon the face of this note
suggesting that it is in any respect an obligation of
the bank. Collier cashed the check without endorse-
ment, took and treated the money as his own, proceed-
ing upon the assumption that he had borrowed it from
appellant, and now maintains that such was intended
by both him and appellant to be the effect of their
transaction of July 26th and 27th.

Collier's version of the conversation had with appel-
lant on those two days is sufficiently shown by the fol-
lowing quotations from his testimony given upon the
trial:

"Q. Are you familiar with the circumstances at-
tending the giving of a note by the defendant Mr. Cof-
fin to the order of the Northern Bank & Trust Com-
pany for $2,000, dated July 27, 1916, being the note
which is involved in this action? A. I am. Q. Please
state the circumstances surrounding the execution of
that note. A. The note—I asked Mr. Coffin for the
note, to exchange a note with me and he gave a note
to the Northern Bank & Trust Company and then gave
me his check for it and I gave him my note in exchange.
Q. He gave you his note in exchange for your note, is
that the idea? A. His note went to the bank and he
gave me his check for my note. Q. He gave you a
check for $2,000? A. Yes, sir. Q. And you gave him
your note for $2,000? A. Yes, sir. Q. State whether
or not there was an arrangement for a loan or some-
thing of that sort as between you and Mr. Coffin?
A. Yes, I took the matter up with him and arranged
that if he would exchange notes that I might be able
to use the $2,000, that was the arrangement. . . .
Q. Did any of the proceeds of that check go to the

bank or did they go to you individually? A. To me. . . .

"Q. Did you take advantage or attempt to take advantage of that fact to coerce or compel him to give this note in question? A. No, I went to him as a friend. We were friends, probably a little more than the average customer of the bank; intimately acquainted during the time he dealt with us and I approached him as a friend. . . .

"Q. Is it not a fact you stated this to him when you saw him at the beginning of this transaction: That the bank needed a little money for a few days and you would like to arrange to have him give his note for the sum of $2,000 for the bank's use and that you would exchange notes? A. No. I needed the money, not the bank. . . .

"Q. It is a fact that Mr. Coffin knew that this $2,000 was for your own personal use? A. He must have, because it was a matter between ourselves. Q. Then if it were a matter between yourselves, why was not the note given to you? A. He was to borrow the money from the bank and give me a check for it; that would complete the transaction entirely and he would deal with me separately."

Collier's testimony also is to the effect, in substance, that it was understood between him and appellant that he, Collier, was to pay to the bank the amount of the note given by appellant to the bank, and in that manner satisfy the note given by him, Collier, to appellant, and not that there should be no liability from appellant to the bank upon his note. No demand was ever made upon appellant in behalf of the bank for payment of his note or of interest thereon. There are two notations upon the note showing payment of interest to December 30th, 1916. This was done manifestly at the instance of, or by, Collier, though appellant himself never made any such payments. This failure to demand payment of the note by the bank, and the endorsement of payment of interest, seems explainable

by the fact that, until the time the bank went into the hands of the bank examiner caused by its insolvency, on January 29, 1917, Collier remained its president and active manager; and desiring to delay paying his note to appellant, he took this means of inducing delay on the part of appellant from seeking to enforce payment of that note.

Appellant testifies, in substance, that, on several occasions after the expiration of the ten-day period the notes were to run, he made demand upon Collier that the note he had executed to the bank be returned to him, he offering to return the note Collier had made to him. Collier's version of these demands is, in substance, that they were not demands which suggested the mere rescinding of the whole transaction, but demands that he, Collier, merely take care of the matter with reference to both notes, so that appellant's debt to the bank would be satisfied. Some time later Collier was convicted and sent to the penitentiary at Walla Walla because of his conduct with reference to the affairs of the bank. This fact is put in evidence only for the purpose of affecting his credibility as a witness.

Should we look alone to the written evidence of the transaction of July 26th, and 27th—that is, the execution and delivery of the notes and the check—there would seem to be no escape from the conclusion that the transaction was intended as a borrowing by appellant of $2,000 from the bank, and the checking of it out thereafter and loaning it to Collier individually. Appellant testifies that he believed he was dealing with the bank, not only in the giving of his note, but also in the receiving of Collier's note—that is, that he believed that he was receiving the note of the bank. In other words, that Collier, in the whole of the transaction, was in legal effect the bank. It is difficult to

follow appellant and reach such a conclusion, even according to his own story. Indeed if his story be true, all that was done seems to have been to no purpose whatever. If appellant was doing all this at the suggestion of Collier for the benefit of the bank—that is, to the end that the bank would thereby acquire the use of $2,000, or the benefit of credit equal to that amount for the period of ten days—we are at a loss to see how such purpose could be accomplished by appellant, in form, becoming the debtor of the bank by the execution of his $2,000 note, and at the same time, in form, become a creditor of the bank by its executing the $2,000 note to him, as he claims was the effect of Collier's note, in exactly the same terms as to date, time to run, amount, and interest. Whatever may be said as to the credibility of Collier as a witness, his story is entirely consistent with the theory that the appellant borrowed from the bank $2,000, to the end that he, appellant, might and did loan it to Collier, as evidenced by the notes and check and their concededly making, all as part of one transaction. Appellant's version of the transaction does not seem to us to be in harmony with the conceded facts, which point, it seems to us, almost conclusively to the actual borrowing from the bank by him of the $2,000. If he believed that the transaction had the legal effect claimed by him, that is, that Collier's note to him was, in effect, the bank's note, we see no escape from the conclusion that he had no warrant for so believing. Collier's note upon its face plainly told him to the contrary.

Some contention is made that, even though Mr. Coffin be liable upon the note, the community composed of himself and wife should not be held liable thereon. This seems to be rested upon the theory that appellant's obligation to the bank was in no event anything more than a surety for Collier, and not for the

benefit of the community. In view of our conclusion that the bank actually loaned appellant $2,000, for which he received credit and used such credit by checking against it, such credit became clearly community property. What appellant did with the money so credited to him upon the books of the bank would in no manner change its community character. The bank parted with $2,000 to appellant. Collier received $2,000 from appellant, not from the bank. In *Johnson v. Bank of Pasco,* 78 Wash. 59, 138 Pac. 295, relied upon by counsel for appellant, the bank did not part with anything.

We see no escape from the conclusion that the judgment of the trial court must be affirmed. It is so ordered.

HOLCOMB, C. J., FULLERTON, and BRIDGES, JJ., concur.